THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. JESÚS LEÓN MARTÍNEZ, Defendant and Appellant.

No. 6973. Argued June 17, 1938.—Decided July 6, 1938.

*L. Tormes García* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

Mr. Justice De Jesús delivered the opinion of the court.

The District Attorney of Ponce filed an information against Jesús León Martínez charging him with the crime

of voluntary manslaughter consisting in the unlawful killing of Jenara Cruz Vélez as a result of a sudden quarrel, by firing three shots at her which produced two wounds from which she died shortly thereafter.

The defendant pleaded not guilty and asked for a jury trial. After the trial the jury brought a verdict finding him guilty of voluntary manslaughter, and the court sentenced him to one year's imprisonment in the penitentiary at hard labor.

■■ From the evidence of the prosecution as well as that of the defense it appears that the deceased and the defendant had lived in concubinage for several years; that the deceased was a wayward woman, quarrelsome, and adict to liquor, while the defendant was a man without previous criminal record, honest and hard working, and who in spite of the fact that he had lost a leg, had always made his own living; that four or five months before the killing of Jenara the defendant and the victim had separated, a thing which did not prevent Jenara, driven by the pangs of jealousy, from frequently visiting the defendant's fruit stand to provoke him and threaten him with the loss of his life; that on the day in question, December 9, 1934, at about 8 o'clock at night, when the defendant was about to close his little shop, the deceased arrived in an infuriated state, insulting the defendant and threatening to cut his throat, and taking a weight of four pounds which was on the counter she assaulted him with it inflicting a wound upon his forehead which bathed him in blood. It was at that moment that the defendant, frightened by the deceased because of her character and antecedents, which he knew, took the revolver that he kept in the drawer and fired the fatal shots at her.

Referring to the moment of the shots the defendant testified:

"When she hit me, I was between the counter and the shelves . . . and when she hit me I got up and stretched my hand and found the revolver, firing three shots at her, but it was unintentional and while

I was in a crazed state because the blow was a hard one, the bleeding was terrific and when I fired the three shots the light went out. . . .'' (Tr. p. 122.)

When asked by his attorney as to how many times Jenara had threatened him with taking his life, he answered:

''Innumerable times, whenever she felt like it. Because she was a woman of a terrific temper. She was not a bad woman but had an awful temper. In 1934 she fought with a man on equal terms.'' (Tr., p. 124.)

Later, in describing his state of mind at the time that he was attacked, he testified thus:

''Q. You say that when she struck you with the weight you went into a terrible panic (*grima*)?
''A. Yes, sir.
''Q. What do you mean by terrible panic (*grima*)?
''A. That she might kill me.
''Q. What made you afraid?
''A. Fear.
'' * * * * * * *

''Q. Yes, when she struck you what did she say?
''A. She said nothing.
''Q. She said nothing at that moment?
''A. When she was provoking me she did. Of course she later stopped provoking me and hit me. Of course, before hitting me she provoked me but after that she hit me, and it was then that I fired the shots.
''Q. Then it was you who went into a panic?
''A. That I thought she would kill me.
'' * * * * * * *

''Q. Tell me, Jesús, are you an invalid?
''A. Yes, sir.
''Q. When you said that you were an invalid, what did you mean?
''A. Well, a man who I believe can not face any serious situation because I am here—let us suppose—sitting down, if I get up my two legs cannot operate together, one with the other.
'' * * * * * * *

''Q .You can not walk without crutches?
''A. No, sir. I am engaged in that small business I have, and of course I stand up and if I have not got my crutches I have to hold

on to something. I now consider myself an invalid because I can not compare myself with a man who has his four limbs, and so I can not face any situation even now that I am an invalid nor before because I have always been proud and not quarrelsome." (Tr. pp. 133 and 134.)

On cross-examination by the district attorney the defendant answered:

"Q. After she struck you?

"A. Yes, sir, after she struck me I fired.

"Q. In vengeance, anger or in rage?

"A. Yes, of course.

"Q. And when you saw that woman before you did you not feel sorry?

"A. What happened to me was that I went into a panic.

"Q. Pardon me, did you not feel some remorse when you fired the three shots at her?

"A. Since I did not fire in a normal state but after being struck, and in a rage. . . ." (Tr., p. 130.)

From the above-quoted testimony it is easy to conclude that the defendant established a *prima facie* case of self-defense to be submitted to the consideration of the jury. The fact that he fired in a rage, or even in thirst for vengeance, as he admitted in answer to a leading question of the district attorney in which said officer used those words, did not preclude him from presenting to the consideration of the jury the facts which in his opinion justified the homicide on the ground of self-defense. We can not expect an invalid who receives a blow on the forehead like the one received herein, to repel the attack with a smile on his lips. It was human that he should feel full of rage and thirsty for vengeance, which conditions are perfectly compatible with the reasonable fear that he might then have of continuing to receive serious bodily injury or losing his life. His means of defense were not those of a man in perfect physical condition. The woman who attacked him was not an inoffensive coward.

In praying for a reversal of the judgment the defendant assigns four errors, claimed to have been committed by the lower court, thus:

"*First.*—The lower court committed grave error, prejudicial to the defendant, in making comments in the presence of the jury, unauthorized by any law of this island, at the time that it was delivering its instructions to the jury as well as at the beginning of the trial.

"*Second.*—The court committed grave error, prejudicial to the defendant, in transmitting to the jury the instruction with regard to self-defense which the defendant had timely and properly requested in writing and in making the remark that it did not know the application of the jurisprudence of California cited by the defendant which this Hon. Court had cited with approval in the case of *People* v. *Chico,* 45 P.R.R. 486.

"*Third.*—The lower court committed grave error, prejudicial to the defendant in transmitting instructions to the jury which contained an incomplete and irregular summary of the testimony of the various witnesses, thus inducing an erroneous weighing of the evidence by the jury.

"*Fourth.*—The verdict in this case is against the law and the evidence."

The first two assignments are so intimately connected with each other that in order to avoid unnecessary repetition we think it advisable to discuss them together and we shall do so.

When the trial commenced, and while Asterio Torres, the first witness for the prosecution, was testifying, the following incident occurred in which the district attorney, the defense counsel, and the judge participated:

"*District Attorney:* How long had you known them both before they were married?

"I met them together at a ward above Santa Isabel, the name of which I do not remember.

"In what year did you meet them?

"I do not remember.

"How long did you know them to be together, how many years?

"Well, about a year and a half, more or less.

"Tell me another thing, when you met this defendant married to Jenara Cruz Vélez, had he both legs or just one?

"*Defense Attorney:* That is immaterial, Your Honor.

"*District Attorney:* It is in order to specify certain facts alleged in the information.

"*Judge:* It is admitted. The jury is looking at the defendant, who has only one leg, and that fact may impress the members of the jury; so that it is proper that they should know whether or not this man had both of his legs on the day in question.

"*Defense Attorney:* Because of the statements of the court, and the comments it has made. . .

"*Judge:* The court is prepared to comment upon everything that it believes to be within the law and let everyone hear his own responsibility in trials by jury in the District Court of Ponce: the prosecuting attorney and the defense counsel with theirs, the jury with theirs, and the judge with whatever responsibility corresponds to him.

"*Defense Attorney:* And the attorney for the defendant also. . .

"*Judge:* That is what I have already said, 'the defense counsel. with his own.' *And let the Supreme Court decide upon this question in cases of trials by jury.*

"*Defense Attorney:* And counsel for the defense is also ready to assume his own; and that is the reason why he takes an exception, because the person entitled to make a comment to defend his points of view with regard to questions raised between the prosecuting attorney and the defendant, is the prosecuting attorney.

"That is why I object, because if the defendant has only one leg, that fact is not now in issue before the gentlemen of the jury; and what the witness must testify is as to the essential facts of the information which are those therein set out and no other which may affect the defendant's physical condition. That is the ground of my objection.

"*Judge:* The district attorney may proceed. . . ."

Although this incident should not have occurred, as the prosecuting attorney of this court has aptly said, we agree with him that it did not prejudice the substantial rights of the defendant. On the contrary, it tended to favor him. From the incident it appeared that the defendant had lost a leg prior to the events of which he was accused and which gave rise to the death of Jenara Cruz Vélez. This circum-

stance placed him in a better position to successfully plead self-defense than if he had been in perfect physical condition. The fact that the judge, in the heat of the incident, mentioned the Supreme Court, could not prejudice the rights of the defendant, because as the trial had just begun and the first witness for the prosecution was testifying, the jury had no reason to believe that the judge had already formed an opinion that they were going to find the defendant guilty and consequently that the Supreme Court would review the judgment on appeal.

██ However, there is no justification whatsoever for the statements made by the judge when he gave the special instruction on self-defense requested by the defendant. This instruction was as follows:

"A person can repel force with force in the defense of the person, property or life against any one who openly attempts by means of violence or surprise to commit a specific misdemeanor or felony, or either of them, or to inflict serious bodily injury to his person, and the danger which would justify the defendant in committing the act charged, may be real or apparent; and the jury do not have to consider whether the defendant was really in danger of his life or property but only whether the circumstances were such that they would have induced a person of sound mind to believe that his person or property were exposed to such danger; and if he could reasonably believe this and had sufficient cause to so believe it, and he committed the act charged under such a belief, even though it should turn out that the deceased was unarmed, it is your duty to acquit him."

Immediately before giving this instruction to the jury, the judge expressed himself in the following terms:

"I am about to give you the instruction in regard to self-defense, but, at the request of the defense, I shall give you the following written instructions which they have submitted me, which is a holding of the Supreme Court, taken from a decision of California that is cited in a case from our Supreme Court, without stating the facts which were before the California court when it gave said instruction. In other words, *we are not acquainted with the facts of*

*the case from California;* at least from the citation which is made from volume 17, *the circumstances which were before the judge of the court of California when he gave that instruction do not appear;* but our Supreme Court cites it with approval and this court has now been requested by the defense to give that instruction to the jury in this case, and this court gives it to you without this judge agreeing with all of the instruction." (Italics ours.) (Instructions, p. 7.)

Immediately after giving the instruction which we have already transcribed, the judge went on to say:

"But I tell you, gentlemen of the jury, in order to judge whether or not this defendant acted in self-defense you must go to the evidence. The evidence is what the jury must analyze in every case and after analyzing it, decide which of the theories offered are worthy of their belief and whether that theory has been supported by the evidence."

In considering the instruction requested by the defense, the judge had before him only three alternatives: to give it in its entirety; to modify it if he thought that it was not entirely correct or that the circumstances of the case did not justify the instruction in the form requested; or deny it if he considered that the instruction was incorrect or was not supported by the evidence. But it is unquestionable that the judge in giving the instruction in the manner that he did, greatly prejudiced the substantial rights of the defendant, for it was useless to give the instruction if when he did so he began by discrediting its importance and informed the jury that the judge himself did not accept the instruction as a correct one. It was unnecessary to set out the facts on which the California court based itself when it gave the above instruction. The principle primarily involved in the instruction is that of the doctrine of apparent danger, universally accepted and sanctioned by sections 209, paragraph 3 and 210 of the Penal Code of Puerto Rico.

To instruct the jury that in order to determine whether or not a defendant acted in self-defense it must go to the evidence and that the evidence is what the jury must analyze

in every case, and after analyzing it decide which of the theories they believe, if said in that unqualified way and especially after the statements which were made before the instruction requested by the defense was given, amounted to saying to the jury that it should totally discard the instruction which had just been given and should apply its own judgment. There is no doubt that the jury in order to determine whether or not self-defense has been established, should analyze the evidence, but this analysis should be made in the light of the law which the judge sets forth in his instructions.

 The prejudice caused to the defendant as a result of the instructions given by the court becomes more evident if we consider the following statements made by the judge to the jury:

"Self-defense is subject to certain rules or requisites; and the first of them is that set forth in section 54 of our Penal Code which provides that the right of self-defense never includes the right to inflict more injury than is necessary under the particular circumstances. What does this mean, gentlemen of the jury? That if one is struck in the face you can defend yourself by striking back in the same manner, but not inflicting more damage than was inflicted upon you. *In Puerto Rico this doctrine is being erroneously applied and it has been thought that a blow in the face can be answered by a shot, and thereafter go to a court and say, 'I shot him in self-defense.'* I am giving you legal instruction, based on what is provided by our substantive law in Puerto Rico, the Penal Code, which until amended, is the law of Puerto Rico on this subject—and my distinguished colleague Mr. Tormes, who is a member of the Legislature, knows this.

"In a case of homicide, gentlemen of the jury, in which self-defense is alleged, it is not only necessary to believe, but to have reasonable grounds to believe, that the person attacked found himself in imminent danger of death or serious bodily injury when he killed his aggressor. As our statute says: not only is it necessary to believe but one must have reasonable grounds to believe. *And that is our substantive law, not the jurisprudence of California which says that thereafter it may turn out that no such thing happened or*

*what one believed to be true was not so, and that even then self-defense is justified."* (Italics ours. Instructions, pp. 10 and 11.)

This instruction is clearly erroneous and it not only discredits the special instruction which had been given by the court at the request of the defense, but also denies the principle of "apparent danger" sanctioned, as we have seen, by our Penal Code. All the authorities, without any exception, as far as we know, admit, with regard to self-defense, that the defendant can successfully plead it when he has justifiable grounds to believe that he is in imminent danger of losing his life or of receiving serious bodily injury, even though it subsequently turns out that the danger really never existed. In the present case the defendant had a perfect right to have the jury take this principle into consideration, free from any prejudicial opinion, in determining whether or not he had acted in self-defense.

▮ In saying in his instructions to the jury that *"in Puerto Rico this doctrine is being erroneously applied* (referring to self-defense) *and it has been thought that a blow in the face can be answered by a shot, and thereafter go to a court and say, 'I shot him in self-defense' "*, and then referring directly to counsel for the defense by saying, *"until it is amended, it is the law of Puerto Rico on this subject—and my distinguished colleague Mr. Tormes, who is a member of the Legislature, knows this"*, the idea could have been carried to the minds of the jury that the judge believed that the defendant in the present case had overstepped his rights in defending itself and that he was not entitled to have the jury consider his case as one of self-defense.

▮ Besides, there was another circumstance which necessarily must have prejudiced the substantial rights of the defendant, and it was the following: at the close of the evidence when the case was ready to be argued by counsel and, when the district attorney was about to begin his address to the jury, the judge interrupted him in the following manner:

"If the district attorney will allow me to . . . I want counsel for the defense to ratify or rectify his theory. The attorney for the defendant set up the theory of self-defense, that the defendant acted in self-defense. In the defendant's testimony he has insisted that he was in a state of insanity as a result of the blow which he received on the forehead and that he acted under the influence of this state of insanity."

Later in the course of its instructions, the court insisted on this point thus:

"I wanted to make it clear and have the defense counsel make it clear to you gentlemen in open court whether he reaffirmed his theory of self-defense or whether he wished to rectify it in accordance with the testimony given by the defendant."

As a matter of justice to the defendant, the jury should never have heard those remarks. They were tantamount to saying to the jury that in the judge's opinion the defendant had no right to plead self-defense, and since in order to establish it the defendant had to admit that he had killed the deceased, if the jury discarded the theory of self-defense it necessarily had to render a verdict of guilty of voluntary manslaughter.

Experience has shown us that although the jury look upon the defense counsel and the district attorney as interested parties in their respective positions, and receive their opinions as to the innocence or guilt of the defendant with the corresponding reserve, it does not assume a similar attitude with respect to the statements of the judge. They see in him an impartial arbiter without any other interest in the controversy than that of having substantial justice done, and since by reason of his position and profession they consider him their superior in the field of weighing the evidence, his opinion as to the innocence or guilt of the defendant is generally decisive with them. For this reason the judge must be very careful and avoid as far as possible making any gesture or statement which may be interpreted by the jury as indicative of his opinion with regard to the merit of the

case. The judge can put any question to a witness which he believes necessary in order to clear up, in the furtherance of justice, any point which may have been left obscure after the examinations by the prosecution and by the defense; but he should not examine a witness for the purpose of contradicting or discrediting him before the jury. This mission is left to the prosecuting attorney and to defense counsel.

We have no doubt that the court committed the first two errors assigned by the defendant.

■ Although the court inadvertently omitted certain details when making a summary of the evidence, as soon as it noticed the omission it rectified and gave the jury the corresponding instruction thus curing the defect in the statement of the evidence. Therefore, this error is nonexistent.

■ We can not agree with the defense that the verdict is necessarily against the evidence and the law. We have already said that the defendant established a *prima facie* case of self-defense and that, therefore, it was incumbent on the jury, after being properly instructed regarding the law applicable to the case, to pass upon the credibility of the witnesses, and after placing themselves in the same position that the defendant found himself when he committed the crime, to determine whether the evidence introduced justified the defendant in his belief that he would receive further serious bodily injury or that he was in imminent danger of losing his life, or whether the evidence introduced with regard to self-defense raised in their minds a reasonable doubt as to the guilt of the defendant. Grigsby's Criminal Law, page 514, note 89, and cases therein cited. We can not, therefore, hold that the verdict is against the evidence. We can only agree with the defense that the defendant did not have a fair opportunity to have the jury consider the evidence in the light of the legal principles applicable to self-defense.

As the first two errors assigned by the defendant were committed, and his substantial rights thereby impaired, the

judgment appealed from should be reversed and the case remanded to the lower court for a new trial.

Mr. Justice Travieso took no part in the decision of this case.